```
     ___ FILED       ___ LODGED
     ___ RECEIVED    ___ COPY

          SEP 0 6 2022

     CLERK U S DISTRICT COURT
        DISTRICT OF ARIZONA
     BY_____ DEPUTY
```

**KAREN MCGHEE**
3855 S. Yaqui Dr.
Flagstaff, AZ 86005
Tel. (928) 380-1783
kmcghee.9@icloud.com

*Plaintiff, pro se*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Karen McGhee**,** | Case No:   **CV22-08155-PCT-SPL** |
| Plaintiff**,** | |
| v. | **VERIFIED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| Forest Ridge Apartments, LLC, an Arizona Limited Liability Company; MC Forest Ridge Managing Member, Inc., an Arizona Corporation, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

### I.    NATURE OF ACTION

1.    This is a civil rights action for damages, and declaratory and injunctive relief, to remedy the Defendants' housing discrimination and retaliation against Plaintiff which has occurred, and is still occurring, through the unlawful conduct of Defendants and their agent(s).

2.    Plaintiff brings this action under the Fair Housing Act of 1968 (the "FHA"), as amended, 42 U.S.C. § 3601 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794, against: **(1)** Forest Ridge Apartments, LLC, an Arizona Limited Liability Company;

1    and **(2)** MC Forest Ridge Managing Member, Inc., an Arizona Corporation; for the

2    damages to Plaintiff caused by the unlawful conduct of Defendants and their agents,

3    including Ciera Hufford, Property Director of Forest Ridge, ("Ms. Hufford"), and for the

4    unlawful conduct of other agents of the Defendants who are unknown at this time but

5    whose identities may be revealed during discovery.

6                    **II.    JURISDICTION AND VENUE**

7            3.      This Court has subject matter jurisdiction over Plaintiff's claims under 28

8    U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), 42 U.S.C. § 3613(a), and 29 U.S.C. § 794a(2).

9            4.      The Court has personal jurisdiction over all Defendants within the District

10   of Arizona because each Defendant is an entity incorporated or organized under Arizona

11   law. A.R.S. § 10-140(23), (37).

12           5.      Venue is proper in the District of Arizona because all of the events

13   complained of occurred in this District and because Defendants maintain principal places

14   of business in this District. 28 U.S.C. §1391(b)(2), (c)(2).

15                          **III.    PARTIES**

16           6.      Plaintiff Karen McGhee, 3855 S. Yaqui Dr., Unit 2A, Flagstaff, Arizona, is

17   an elderly and disabled person who is currently a residential tenant of the Defendants

18   pursuant to a residential lease agreement.

19           7.      Defendant Forest Ridge Apartments, LLC, ("Forest Ridge"), is a limited

20   liability company organized under Arizona law with a principle address of 15170 N.

21   Hayden Rd., Suite 1, Scottsdale, Arizona, who has entered into a residential lease

22   agreement with Plaintiff.

23           8.      Defendant MC Forest Ridge Managing Member, Inc., ("MC"), is an

24   Arizona corporation with a principle address of 15170 N. Hayden Rd., Suite 1,

25   Scottsdale, Arizona, and manages Forest Ridge.

26

## IV.    FACTUAL ALLEGATIONS

9.    Plaintiff is a participant in the federal Housing Choice Voucher program. 42 U.S.C. § 1437f.

10.    Defendants have entered into a Housing Assistance Payment contract with the City of Flagstaff Housing Authority, ("CFHA"), 24 C.F.R. § 982.451, and thereby receive housing assistance payments from the CFHA on behalf of Plaintiff under a federal program. *Id.*

11.    Plaintiff is a disabled person who receives supplemental security income pursuant to Title XVI of the Social Security Act. 42 U.S.C. § 1381, *et seq.*

12.    Plaintiff is an elderly person who receives Medicare benefits.

13.    Plaintiff has been diagnosed with, and receives ongoing professional care for, the following medical conditions:

    a.   degenerative disc disease;

    b.   osteoarthritis;

    c.   fibromyalgia;

    d.   since 2002 she has been treated for ongoing serious health problems and complications related to previous exposure to pathogenic mold species;

    e.   hypothyroidism;

    f.   left ventricular hypertrophy;

    g.   MTFHR gene mutation; and

    h.   gastric ulcers.

14.    Plaintiff has also been diagnosed with, and receives ongoing professional care for, the following psychiatric conditions:

    a.   Post-traumatic stress disorder;

    b.   major depressive disorder;

    c.   generalized anxiety disorder; and

3

d. panic disorder;

15.  <u>Beginning in 1998 and ending in 2002</u>, Plaintiff was exposed to high-levels of airborne mycotoxins due significant (undiscovered) water intrusion into her home, which later caused the growth of several toxic mold species. Thereafter, Plaintiff developed both acute and long-term health complications from this exposure[1] and which are well-documented in her medical records.[2]

16.  <u>Beginning in 2014 and continuing through the present</u>, Plaintiff began receiving outpatient mental health services, including counseling therapy and medication, from Southwest Behavioral and Health Services, ("Southwest"), in Flagstaff, Arizona for the treatment of the mental health conditions as described above.

17.  On the morning of <u>September 27, 2022</u> Plaintiff began vomiting large amounts of blood. Shortly thereafter, she collapsed and lost conscious for an unknown period of time. When she eventually regained consciousness Plaintiff dialed 9-1-1 and was later taken by ambulance to the Flagstaff Medical Center's Emergency Department where it was determined that she was suffering from "class 3 acute hemorrhagic anemia"[3] due to the presence of multiple gastric ulcers.[4] Plaintiff was thereafter admitted to the Intensive Care Unit, (the "ICU"), at FMC where it was later determined that she had lost approximately <u>2-3 liters of blood</u>.

---

[1] Respiratory exposure to toxic fungal metabolites causes a disease state known as mycotoxicosis. This is an example of "'poisoning by natural means' and [is] analogous to the pathology[y] caused by exposure to pesticides or heavy metal residues. The symptoms of a mycotoxicosis depend on the type of mycotoxin; the amount and duration of the exposure[.]" J.W. Bennett & M. Klich, *Mycotoxins*, CLIN. MICROBIOL. REV. 2003 Jul;16(3):497-516, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC164220/pdf/0050.pdf.

[2] Plaintiff was thereafter diagnosed with a MTFHR gene mutation <u>which makes her especially vulnerable to the toxic effects of pathogenic mold species</u>.

[3] Plaintiff lost approximately 40-50% of her total blood volume from this hemorrhaging.

[4] Plaintiff was negative for *H. pylori* infection.

4

18.     On <u>September 29, 2021</u> and while she was still in the ICU, Plaintiff signed an apartment lease contract, (the "ALC"), with Defendants to rent unit 2A at the Forest Ridge Apartments, 3720 S. Yaqui Dr., Flagstaff, Arizona, (the "Unit"). (Ex. 1). Per the terms of the ALC: **(1)** Plaintiff was permitted to keep two disability-related service animals in her home; and **(2)** the lease was to expire on <u>August 31, 2022</u> *but with an automatic renewal provision set forth therein.* (Ex. 1 at ¶ 3).

19.     Pursuant to the terms of the ALC, Defendants are permitted to enter a tenant's unit <u>only as follows</u>:

> "Except in case of emergency or when it is impractical to do so, landlord ***will give*** at least 2-day advance written notice of ***any*** entry into an apartment. <u>This notice may be *hand delivered to someone in the apartment*</u>, or may be sent certified or registered mail … <u>Notice to us of a service or maintenance request automatically grants us the authority to enter the apartment at all reasonable times for the purpose of that request.</u>[5] We have the right to enter in case of emergencies and, <u>subject to notice requirements</u>, in cases where entry is for … making repairs or replacements; estimating repair or refurbishing costs…" (Ex.1 at ¶ 28) (emphasis added).

20.     On <u>October 1, 2021</u> and while she was still in the ICU, Plaintiff's adult son and several of his friends moved all of Plaintiff's belongings into the Unit.

21.     Beginning shortly after Plaintiff moved into her home, she began to experience newly emergent physical and psychological symptoms including increased fatigue, worsening anxiety, worsening depression, headaches, bleeding sinuses, shortness of breath, memory lapses, muscle aches, blurred vision, joint stiffness and pain, and frequent skin itching.

---

[5] The ALC explicitly sets forth that *any* entry into an apartment other than on an emergency basis ***requires*** Forest Ridge to provide a minimum of two days' notice either by certified or registered mail, or by hand-delivery "to someone in the apartment." <u>The statutory waiver of notice found under § 33-1342(B) therefore does not apply here.</u> *See* A.R.S. § 13-1303 ("Unless displaced by the provisions of this chapter, the principles of law and equity, including the law relating to capacity to contract [and] mutuality of obligations … supplement its provisions.")

22.     Around January of 2022 Plaintiff began to suspect the present of pathogenic mold in her air ducts. Thereafter, she stopped using her furnace and instead used space heaters, at which point her symptoms began to decrease.

23.     Later that month, Plaintiff reported to Defendants that she suspected the presence of pathogenic mold species in her home's air ducts based on the fact that she had a reaction consistent with her prior exposure but which decreased when she stopped using her furnace.

24.     Around February of 2022 and due to her symptoms, Plaintiff requested that Defendants perform an inspection to determine whether or not there was pathogenic mold contamination in her air ducts.

25.     On March 25, 2022 Forest Ridge placed a notice on Plaintiff's door[6] advising her that "Breathe Easy of Arizona intend[ed] to enter the premises on Tuesday, March 29th between 12:30 pm – 5:00 pm … [and would be] conducting a vent duct inspection and clean out." (Ex. 2). Forest Ridge advised Plaintiff that this process would "require [Breathe Easy] to [enter her] apartment," and requested that Plaintiff "make arrangements to allow [Forest Ridge] access to [her] apartment [at that time]," and that if Plaintiff had pets to "either make arrangements to be home, or for the animals to be kenneled." *Id.* (emphasis added).

26.     On March 25, 2022 Plaintiff sent an email to Ms. Hufford regarding the mold that was found in the ventilation ducts of her apartment. (Ex. 3). In this email Plaintiff explained that "[t]he problem with cleaning the ductwork without having it tested beforehand is that whatever is up there it's going be spewed into the apartment," *id.*, and asked Ms. Hufford if she thought it was "wise to clean the ductwork before the

[6] This notice *did not comply* with the pre-entry notice requirement as set forth under the ALC. (Ex.1 at ¶ 28) ("This notice may be hand delivered to someone in the apartment, or may be sent certified or registered mail.")

mold is addressed [or] before it's at least tested?" *Id.* Plaintiff's email went on to state that she previously had been "<u>exposed *extensively* to stachybotrys, and [aspergillus]</u>,"[7] and that because of her prior exposure she is "now *very reactive* to mold spores." *Id.* (emphasis added). <u>Neither Defendants nor any agent thereof ever responded to this email</u>.

27.    On <u>March 27, 2022</u> Plaintiff began experiencing symptoms consistent with Covid-19 infection. Later that day, she sought guidance from the U.S. Centers for Disease Control, which advised her to self-quarantine for five (5) days.

28.    On <u>March 28, 2022 at 4:40 P.M.</u>, Ms. Hufford emailed Plaintiff to notify her that: **(1)** Breathe Easy was scheduled to do vent clean the next day; **(2)** that Ms. Hufford had "delivered a notice for entry for this" cleaning; and **(3)** and which requested that Plaintiff and her pets[8] "not be in the home while they conduct the cleaning." (Ex. 4). This email concluded with Ms. Hufford telling Plaintiff that "[d]ue to this being a concern of [hers], [Defendants] would like to extend an offer for a mutual lease break to allow [Plaintiff] the opportunity to *<u>find somewhere that best fits [her] needs</u>*." *Id.* (emphasis added).

29.    On <u>March 28, 2022 at 6:32 P.M.</u>, Plaintiff emailed Ms. Hufford to notify her that Plaintiff was experiencing "Covid symptoms" and that "[a]ccording to the CDC guidelines" it was necessary for Plaintiff to self-quarantine "<u>for five days</u>." (Ex. 5) (emphasis added). Plaintiff further stated in this email that it would be greatly advisable for Breathe Easy not to clean the duct system the next day so as not to cause "a lot of dust [to fill] the air," because Plaintiff was struggling with breathing and she would "<u>hate to end up ... [on a] respirator</u>." *Id.* (emphasis added). Plaintiff concluded this email by advising Ms. Hufford that due to Plaintiff's probable Covid-19 infection she would not be

---

[7] These are two species of pathogenic mold. *See supra* note 1.

[8] Plaintiff does not have any pets. Rather, she has assistance animals which are described in her lease. (Ex. 1 at 50).

letting anyone into her apartment the following day for cleaning because she was going to follow the CDC's recommendation that she "self-quarantine." *Id.* Neither Defendants nor any agent thereof ever responded to this email.

30. On March 29, 2022, the day that Plaintiff was "requested" by Defendants to remove herself and her assistance animals "while [Precision] conduct[ed] the cleaning" in *her home* and where Defendants had neither made arrangements to, nor even offered to, provide temporary shelter for Plaintiff and her assistance animals, **the *high* temperature in Flagstaff was *41°F*.**[9]

31. On March 29, 2022 Lucille Cannon, Plaintiff's Care Coordinator at Southwest, emailed Ms. Hufford on Plaintiff's behalf asking that Defendants have the air vents in Plaintiff's apartment "tested for mold before [being] cleaned." (Ex. 6). Neither Defendants nor any agent thereof ever responded to this email.

32. On March 31, 2022 Plaintiff retained[10] Tallpines Environmental Consulting, ("Tallpines"), 1803 N. Rain Tree Rd., Flagstaff, Arizona, 86001, to conduct a microbial assessment inside of her apartment, to include: **(1)** visual inspection; **(2)** infrared camera assessment; and **(3)** targeted moisture meter survey to assess for microbial contamination (fungal, mold, and/or bacteria related to water damage). This was to be followed by the collection of different types of sample: bulk, swab, WallChek[11] (wall/ceiling cavity air sample) and/or occupied air. (Ex. 7).

33. On March 31, 2022 Plaintiff was sent a letter via certified mail from Glazer Hammond, PLLC, attorney for Forest Ridge, *unequivocally* notifying her that her lease

---

[9] *See* https://www.accuweather.com/en/us/flagstaff/86001/march-weather/326854. Plaintiff respectfully requests the Court take judicial notice of this fact. Fed. R. Civ. P. 201(b)(2).

[10] For their services, Plaintiff paid Tallpines $750.00—money which she had to borrow from friends.

[11] *See* https://www.emlab.com/m/store/WallChek%20User%20Manual.pdf

1  was being terminated pursuant to A.R.S. §33-1376(A) and alleging that "on March 29,

2  2022, [Plaintiff] was served with a 'Notice to Enter' per A.R.S. § 33-1343 for the March

3  29, 2022, cleaning. When management arrived on March 29, 2022, with representatives

4  of Breath Easy AZ who had come from Cottonwood, [Plaintiff] denied access and

5  refused entry … [in] violation of A.R.S. § 33-1343(A)(B) and A.R.S. § 33-1376(A) as

6  well as ¶ 28 of [her] lease agreement[.]" (Ex. 8 at 1).[12] This email concluded by advising

7  Plaintiff that management had elected to terminate her rental agreement effective ten (10)

8  days from her receipt of the Notice and that "demand is hereby made that [she] vacate

9  [her] apartment and make arrangements with this office to turn in [her] keys within the

10  time set forth above." *Id.* at 2.[13]

11      34.    On April 4, 2022 Tallpines conducted the microbial assessment in

12  Plaintiff's apartment. This assessment was conducted specifically by Patty Luttrell, a

13  registered geologist (R.G.) in the State of Arizona and who is: (**1**) board-approved by the

14  American Council for Accredited Certification (ACAC) as a certified microbial

15  consultant; (**2**) a federally-certified AHERA Building Inspector/Management Planner; (**3**)

16  a federally-certified EPA Risk Assessor; (**4**) manufacturer-trained on the RMD x-ray

17  analyzer (XRF); and (**5**) manufacturer-trained on the FLIR B2 infrared thermal camera.

18      35.    On April 5, 2022 Ms. Luttrell returned to Plaintiff's apartment to collect a

19  WallChek air sample, two surface swabs, and a particulate characterization of one of the

20

21

22

23  [12] Defendants knew or reasonably should have known that Plaintiff's then-infection with Covid-19 constituted reasonable cause under Arizona law for her to withhold consent for Defendants to enter her unit. *See* A.R.S. § 33-1343(A) ("The tenant

24  shall not *unreasonably* withhold consent to the landlord to enter into the dwelling unit…") (emphasis added).

25  [13] Defendants were required to, but did not, provide to Plaintiff's caseworker at the

26  Flagstaff Housing Authority, Alec Walsh, a copy of the March 31, 2022 10-day notice. *See* 24 C.F.R. § 982.310(e)(2)(ii).

swab samples. (Ex. 9 at 3). The samples were thereafter shipped to Eurofins[14] EMLab P&K, ("EMLab"), 1505 W Knudsen Dr, Phoenix, Arizona, 85027. *Id.*

36.     On April 5, 2022 Ms. Cannon sent a letter to Defendants on Plaintiff's behalf advising that "[t]he situation regarding the mold, the inspectors, and the cleaning company has negatively impacted her mental health and may continue to negatively impact her mental health in the future. Please consider the situation's potential impact on Karen moving forward." (Ex. 10). Neither Defendants nor any agent thereof ever responded to this letter.

37.     On April 6, 2022 Keith Hammond of Glazer Hammond, PLLC, emailed Plaintiff notifying her that "the 10-Day notice is withdrawn." (Ex. 11).

38.     On April 8, 2022 Plaintiff's treating physician, Cooper Schraudenbach, MD, of Flagstaff, wrote a letter on behalf of Plaintiff advising Defendants that Plaintiff had been under his care and which noted that Plaintiff was "**requesting reasonable accommodations** during air duct servicing to avoid undue exposure to mold and allergens—she has an *extensive history of mold allergy and sensitivity*, along with multiple other medical problems that could be exacerbated"). (Ex. 12) (emphasis added).

39.     On April 11, 2022 Plaintiff emailed Ms. Hufford requesting that "48 hour notices … not be placed in the crevice between the door jam and the door." (Ex. 13). This email constituted a *de facto* request that Forest Ridge abide by the notice requirements as set forth under the ALC. Neither Defendants nor any agent thereof ever responded to this email.

---

[14] "Eurofins Scientific … is the world leader in food, environment, pharmaceutical and cosmetic product testing, discovery pharmacology, forensics, advanced material sciences, and in agroscience Contract Research services … With 58,000 staff across a network of more than 1,000 independent companies in 54 countries and operating 900 laboratories, Eurofins offers a portfolio of over 200,000 analytical methods for evaluating the safety, identity, composition, authenticity, origin and purity of biological substances and products…" *See* https://www.eurofins.com/about-us/.

40.     On <u>April 13, 2022</u> Tallpines provided Plaintiff with a 28-page report of its findings from the microbial assessment conducted in Plaintiff's residence on April 4th and 5th of 2022. (Ex. 9). Ms. Luttrell's visual inspection found that (among other problems), that: (**1**) both the return air grill and interior of the furnace plenum were dirty, *id.* at 2; and (**2**) the wall-mounted supply air vent in the living room was "visibly dirty with long, dark fibers of unknown origin, *id.*at 3.[15] The EMLab analysis as reported in the TallPines report found: (**1**) "a total fungal count of 3600 counts per cubic meter (c/m3)"; (**2**) that "[t]he genera of mold is dominated by *Penicillium/Aspergillus* mold spores … *These two genera of mold have the ability to produce mycotoxins [], and are of concern when measured in elevated counts in the indoor environment. <u>There is an elevated count of toxic mold that warrants remediation of contaminated materials</u>"; (**3**) "66 total counts per square centimeter (c/cm2) of a mixture of allergenic (ability to induce an allergic reaction in humans) and toxic mold."; (**4**) "56 c/cm2 <u>dominated by *Cladosporium*, **an allergenic mold**</u>;[16] and (**5**) the particulate characterization test collected from the bathroom supply air vent found "2% fungal spores [and] 5% glass fiber (fiberglass)" contamination and noted that "<u>the presence of fiberglass (glass fiber) is of concern</u>."[17] (Ex. 9 at 4). (emphasis added).

---

[15] Ms. Luttrell noted in her report that she was "unable to open the vent because the screws and grill [had] been painted shut." (Ex. 9 at 3).

[16] "*Cladosporium* is an opportunistic pathogen, and <u>patients with impaired immunity are susceptible to infection by Cladosporium</u> … exposure [can] occur[s] by inhalation" U.S. Consumer Product Safety Commission, CPSC Staff Statement on Toxicology Excellence for Risk Assessment (TERA) Report: *Review of the Health Risks of Mold, Health Effects of Molds and Mycotoxins*, (2015); *see* https://www.cpsc.gov/s3fs-public/CPSCStatementmoldmycotoxinhealtheffectsJuly2015.pdf at 33.

[17] "If recirculating supply air is allowed to blow across fiberglass, glass fibers will eventually dislodge and become entrained with the duct. When glass fibers (and other particulates) are drawn into the HVAC blower motor, the blower grinds the fibers into smaller fibers which are then forced through the duct system that distributes conditioned air throughout the interior of [Plaintiff's] apartment." *Id.*

41.     Accordingly, Tallpines made the following *minimum* recommendations in their report: **(1)** conduct testing of the fibrous duct sample provided by Breathe Easy, and the attic blown-in insulation - this will provide valuable information regarding the source of the unknown fibrous material contaminating the duct work, and will minimize on-going contamination; **(2)** hire a licensed HVAC Contractor to investigate and remove the source of the fibrous material (breach in duct work allowing attic insulation to enter recirculating air, former flexible duct work now in poor condition, etc.), thoroughly clean the HVAC unit and duct work as well as pressure test the duct work for breaches; **(3)** hire a licensed remediation Contractor to remove mold contaminated materials under/inside both the kitchen and bathroom sink cabinets; **(4)** have building maintenance reinstall the living room carpet/pad, repair/replace the loose window screen in the 2nd floor bedroom, determine the purpose of the cardboard restricting fresh makeup air into the apartment, and correct, if warranted, and add gutter downspout extensions so that drainage is away from the building envelope; and **(5)** post-remediation testing to document the thoroughness of the removal of both mold and rockwool/fiberglass insulation should be tested by a third party industrial hygiene company. (Ex. 9 at 5). Tallpines additionally made the following recommendations for proper remediation of the biological contamination of Plaintiff's apartment:

> "All remediation work should be completed by a State licensed Contractor qualified to conduct bioremediation. The selected remediation Contractor is to conduct remediation using negative air pressure, and personal protective equipment (PPE). The Contractor is to use good OSHA work practices and engineering controls *to minimize the release of airborne spores during the remediation activities*. Demolition and removal of microbially contaminated building materials, and a thorough biocleaning is to be conducted inside the regulated work areas. It is *essential* that contaminated building materials scheduled for removal be wet with a fungicide/biocide prior to disturbance. **Dry removal can result in the aerosolization of millions of spores**.
>
> It is *critical* that the sources of water intrusion that have supported the indoor growth of mold, and the sources of rockwool/fiberglass

1
2

inside the duct work, be corrected. <u>Failure to fix the sources of water intrusion and duct work contamination, and leaving contaminated materials in place, can result in on-going contamination, destruction of building materials, *and health complaints*."</u> *Id.*____

3   42.   On <u>April 15, 2022</u> Ms. Hufford sent an email to Plaintiff informing her that

4  Precision  Restoration,  ("Precision"),  was  scheduled  to  conduct  an  under-cabinet

5  inspection and remediation on April 21st. (Ex. 14). Ms. Hufford further advised Plaintiff

6  in this email that Precision would be putting up a barrier and would have a HEPA-

7  vacuum on hand and requested that Plaintiff "<u>remove [her]self and [her] animals from the</u>

8  <u>home</u>" while Precision performed this cleanup work. *Id.* (emphasis added). <u>Neither Ms.</u>

9  <u>Hufford nor the Defendants offered to assist Plaintiff in any manner so that she could</u>

10 <u>comply with their request that she and her assistance animals vacate the apartment while</u>

11 <u>Precision performed their work in her home</u>. Ms. Hufford's April 15th email moreover

12 told Plaintiff that the buckle in the carpet was caused by the carpet stretching and that <u>the</u>

13 <u>Defendants would not be fixing this problem "*unless all furniture was[first] removed*</u>

14 <u>*from the room*" by Plaintiff</u>. *Id.*

15   43.   On <u>April 16, 2022 at 2:12 P.M.</u>, Plaintiff replied to Ms. Hufford's April 15th

16 email asserting that since Plaintiff "had absolutely no part in the living room floor

17 acquiring a noticeable lump, and because that lump is a tripping hazard" she saw "no

18 reason why maintenance cannot move [her] living room furniture and repair the issue

19 with the lump underneath the living room carpet." (Ex. 15). <u>Neither Defendants nor any</u>

20 <u>agent thereof ever responded to this email</u>.

21   44.   On <u>April 19, 2022</u> Plaintiff advised Ms. Hufford by email that Plaintiff did

22 not have a "place to go for the entire day Thursday," nor did she "have any place to take

23 [her] cats." This email from Plaintiff additionally noted that she "found a 48 hour notice

24 on [her] door" after specifically asking Ms. Hufford in a previous email not to put those

25
26

13

notices on her door "because it's windy and [they can] be blown away."[18] (Ex. 16). Neither Defendants nor any agent thereof ever responded to this email.

45.    On April 20, 2022, Plaintiff sent Ms. Hufford an email with an attached copy of the April 8, 2022 letter written by Plaintiff's physician on her behalf, , a copy of which was attached to the email,  that was provided to Hufford, and because she had no place to stay with her cats for the day, Plaintiff was "**request[ing] reasonable accommodations** that the management put [her] up some place, otherwise [she would] be forced to remain in the apartment with [her] cats while the remediation is in progress." (Ex. 17) (emphasis added). Neither Defendants nor any agent thereof ever responded to this email. Accordingly, as so far as Plaintiff was aware the mold remediation was to proceed the next day as scheduled.

46.    On April 21, 2022 after Precision Restoration failed to show up to perform the remediation, Plaintiff emailed Ms. Hufford the following:

> "As I shared with you on several emails, I do not have any place to go with my cats with only 48 hour notice. Therefore I was here, in my apartment, today waiting … for [P]recision [R]estoration to show up. At 12:15 [PM] I made a phone call to [P]recision restoration and I talked to Don [who] informed me that he had called your office yesterday and canceled the appointment for today. He said he rescheduled it for Tuesday or Wednesday of next week.
>
> My question is how is it that no one in the office called me to notify that this has been canceled. If I had been able to rent a motel for today for myself and my cats would you have reimbursed me?
>
> Additionally, again I found a 48 hour notice on my door for today's appointment on Tuesday… I sent an email specifically asking you not to do that[19] because [the] wind … could easily blow [away] a piece of paper that is rolled up and stuffed between the door handle and the door frame. Then the paper blows away and you guys show up.  what? then I get another eviction notice? I need you to send me

---

[18] This email was a *de facto* second request by Plaintiff that Forest Ridge abide by the notice requirements as set forth under ¶ 28 of the ALC.

[19] This was Plaintiff *third substantive request* that Management abide by ¶ 28 of the ALC.

emails for your 48 hour notice."[20] (Ex. 18) (emphasis added).

47.     On Apr 25, 2022 at *10:49 A.M.*, Ms. Hufford emailed Plaintiff to notify her that Precision Restoration would be starting the work on Plaintiff's apartment on April 27th at *9:00 AM* and that Ms. Hufford would "deliver a 48 hour notice to [Plaintiff's] door to make sure [she was] aware. Please remove all personal belongings from the bottom kitchen cabinets and anything from the countertop space." (Ex. 19).

48.     At 11:14 A.M. that same day Plaintiff replied to Ms. Hufford's email with the following:

> "I'm not going to be able to remove anything from the kitchen any time soon- I did all of that last Thursday, the day that Precision didn't show up, and am now dealing with *muscle spasms and nerve pain* from the exertion … Perhaps we should cancel the appointment for this week, pending resolution of the muscle spasms and nerve pain … **This is an official request for 'Reasonable Accommodation' as per the Americans with Disabilities Act** due to my chronic (now acute) pain from my removing objects from on and around the kitchen counters awaiting the arrival of precision remediation." (Ex. 20) (emphasis added).

49.     At 5:32 P.M. that same day, Plaintiff emailed to Ms. Hufford a copy of a letter from Flagstaff Urgent Care stating that Plaintiff could not lift more than 10 pounds. (Ex. 21). Neither Defendants nor any agent thereof ever responded to this email.

50.     On April 26, 2022 a notice from Defendants was placed on Plaintiff's door informing her that Precision Restoration would be entering her apartment the next day between 9:00 A.M. and 5:00 P.M., and which requested that Plaintiff make arrangements for herself and her assistance animals "to be out of the home." (Ex. 22) (emphasis added).

51.     On April 27, 2022 Precision Restoration completed their work in Plaintiff's apartment. Plaintiff, who had no place to go and no means of transportation with which to

---

[20] Neither Defendants nor any agent thereof ever responded to this email.

transport her assistance animals regardless, was inside of her home during the entire process. Thereafter, Plaintiff developed and was treated for a sinus infection and *a fungal infection*.

52.   On <u>May 10, 2022</u> Forest Ridge maintenance came to Plaintiff's apartment to finish repairs where no prior notice was provided to Plaintiff as required under the ALC. Thereafter, Plaintiff emailed Ms. Hufford the following:

> "Maintenance dropped by to finish the repairs, <u>but I got absolutely no notice that this was going to occur.  No 48 hour notice and no email confirming the time/date I had suggested in previous email.</u> This is disturbing to me, as I'm very much under the weather today. [I] didn't know if a 48 hour notice had been placed on door and perhaps surrendered to the wind.
>
> <u>I specifically requested that I be notified through email when there was any need for management reps to enter my apartment- this did not happen.  I insist on being properly notified henceforth.</u>
>
> <u>This is my official notice requesting that the invasive behavior cease.</u>
>
> I require 48 hour notice through EMAIL to insure that I receive all notices, I'd prefer not to throw caution to the (literal) wind." (Ex. 23) (emphasis added).

53.   On <u>May 11, 2022</u> Ms. Hufford emailed Plaintiff in reply to Plaintiff's email sent the previous day, as follows:

> "Jesse our Maintenance Supervisor let me know he stopped by and completed the work yesterday. We didn't serve you with a 48 hour entry notice due to you scheduling the work with us when you placed it online … I attached the work order that was submitted it's located in the access notes.
>
> *Per landlord tenant laws if management needs to access the home and the resident isn't there to grant access, this is when the 48 hour entry has to be served to enter home*[21] *… Typically, we only need to serve the resident with a 48 hour notice if it's work a vendor is coming out to complete on behalf of the management company. Or other such cases are if we are unable to reach the resident to schedule with them*"[22] (Ex. 24) (emphasis added).

---

[21] *Contra* A.R.S. § 33-1343(D).

[22] *Contra* (Ex. 1 at ¶ 28) (the ALC <u>unequivocally</u> sets forth that "[e]xcept in case

54.     On <u>June 8, 2022</u> Defendants, via an automated email to all residents with soon-to-be-expiring leases, sent Plaintiff an automated email with the following:

> "Hello Karen,
>
> I hope that you are having a great day so far! I just wanted to see if you were planning on renewing with us or if you were needing to put in your notice. We will need a 60-day written notice if that is the case. If not, yay! We would love to have you for another year!
>
> We will be delivering the renewal letter to your door this week that will show you your new rent." (Ex. 25).

55.     On <u>June 15, 2022</u> Ms. Hufford sent a letter to Plaintiff via certified mail informing Plaintiff that ***her lease would not be renewed*** <u>*and that she would have to*</u> <u>*vacate the premises no later than August 31, 2022*</u>. (Ex. 26).

## V.     LEGAL BASIS OF CLAIMS

56.     Discrimination on the basis of disability in a federally-subsidized housing program is actionable under the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Rehabilitation Act, 29 U.S.C. § 794. *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 362 (8th Cir. 2003).

57.     Defendants Forest Ridge and MC participate in the Housing Choice Voucher program and accept payments from the Flagstaff Housing Authority on behalf of Plaintiff. Defendants therefore participate in a federally-subsidized housing program for the purposes of the Rehabilitation act. 29 U.S.C. § 794(b)(3)(A)(ii).

## A.     THE FAIR HOUSING ACT

**The Fair Housing Act prohibits discrimination against disabled persons.**

58.     The Fair Housing Act, (the "FHA"), makes it unlawful: **(1)** to discriminate in the rental of, or to otherwise make unavailable or deny[23] a dwelling to renter because

---

of emergency or when it is impractical to do so, <u>landlord ***will give*** at least 2-day advance written notice of ***any*** entry into an apartment</u>") (emphasis added).

[23] "Deny" or "otherwise make unavailable" language in 42 U.S.C. § 3604(a) proscribes any conduct which makes housing unavailable as well as all practices that

1  of a handicap;[24] **(2)** to discriminate against any person in the terms, conditions, or

2  privileges of rental of a dwelling, or in the provision of services or facilities in connection

3  with such dwelling, because of a handicap, 42 U.S.C. § 3604(f)(1)-(2); and **(3)** for a

4  landlord to refuse to make reasonable accommodations when such accommodations may

5  be necessary to afford such person equal opportunity to use and enjoy a dwelling.

6       59.    The threshold for pleading discrimination claims under the FHA is low: No

7  higher than the relaxed notice pleading standard of Federal Rule of Civil Procedure 8(a),

8  *viz.*, "a short and plain statement of the claim showing that the pleader is entitled to

9  relief." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992

10  (2002) (a plaintiff need not establish a *prima facie* case of discrimination in the

11  complaint, since the *prima facie* case is "an evidentiary standard, not a pleading

12  requirement," and often requires discovery to fully adduce); *Edwards v. Marin Park, Inc.*,

13  356 F.3d 1058, 1061-62 (9th Cir. 2004) (extending the Court's holding in *Swierkiewicz* to

14  FHA claim); *see see also Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49 (9th Cir.

15  1997) (applying FRCP 8(a) liberal pleading standard to FHA claims and noting that this

16  standard "contains 'a powerful presumption against rejecting pleadings for failure to state

17  a claim'" (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 386 (5th Cir. 1985))).

18       60.    Attorney's fees under the FHA are awarded pursuant to 42 U.S.C. §

19  3613(c)(2). *San Pedro Hotel Co. v. City of L.A.*, 159 F.3d 470, 472 (9th Cir. 1998).

20

21

22

---

23  have effect of denying dwellings on prohibited grounds, and that in any way impede,
24  delay or discourage prospective buyer or renter. *Secretary on behalf of Kevin Kelsay v Alicia Wagner, et al.* (6/22/92) HUDALJ 05-90-0775-1.

25  [24] While the FHA refers to discrimination based on "handicap" rather than disability, 42 U.S.C. § 3604(f), these terms are essentially synonymous. *See Giebeler v.*
26  *M&B Assocs.*, 343 F.3d 1143, 1146 n.2 (9th Cir. 2003) (using the terms interchangeably and stating the same rationale for doing so).

18

**Discrimination by eviction or attempted eviction violates the FHA.**

61.     The FHA also prohibits discriminatory conduct designed to drive an individual out of his or her home. 42 U.S.C. § 3617; *see also Egan v. Schmock*, 93 F. Supp. 2d 1090, 2000 U.S. Dist. LEXIS 5234 (N.D. Cal. 2000).

62.     Even attempted discriminatory evictions can violate § 3617's prohibition against interference with § 3604 rights. *Bloch v. Frischholz*, 587 F.3d 771, 2009 U.S. App. LEXIS 24917 (7th Cir. 2009) (claim for coercion, intimidation, threats, and interference with or on account of plaintiff's § 3604 rights does not require that plaintiff actually vacate premises).

63.     To establish a *prima facie* case of handicap discrimination by eviction or attempted-eviction of a sitting tenant under § 3604, the plaintiff must demonstrate that: **(1)** she is member of protected class; **(2)** that she was evicted or her lease was not renewed; and **(3)** defendants, or their agents or employees, knew or had reason to know of her handicap prior to evicting her. *Secretary on behalf of Rayne Hymn and Rayne Hymn v Courthouse Square Company, et al.* (8/13/01) HUDALJ 08-95-0321-8; *see also Saint Patrick v. Rhi 1 San Norterra LLC*, No. CV-22-00462-PHX-DLR, 2022 U.S. (three month window between protected activity and alleged discriminatory conduct sufficient for *prima facie* case).

**Discrimination by refusal to reasonably accommodate violates the FHA.**

64.     The FHA prohibits a landlord's refusal to make reasonable accommodations when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(2), (f)(3)(B); *Salisbury v. City of Santa Monica*, 998 F.3d 852, 854 (9th Cir. 2021); *see also Secretary on behalf of Andrew Rusinov v Jankowski Lee & Associates, et al.* (6/30/95) HUDALJ 05-93-0517-1 (by adding § 3604(f)(3)(B), Congress recognized that discrimination against disabled persons included not only outright invidious discrimination, but also

19

1   included failure by landlord to take affirmative steps to ensure that disabled tenants enjoy

2   use of facility to same extent as non-disabled individuals).

3        65.    A failure-to-accommodate plaintiff claim under § 3604(f)(2) and (f)(3)(B)

4   must show: (**1**) the existence of a covered handicap; (**2**) the defendant's knowledge or

5   constructive knowledge of that handicap; (**3**) that an accommodation may be necessary;

6   (**4**) that the accommodation is reasonable; and (**5**) that the defendant refused to make the

7   necessary and reasonable accommodation upon request. *Giebeler v. M&B Assocs.*, 343

8   F.3d 1143, 1144 (9th Cir. 2003). Ordinarily, an accommodation is reasonable under the

9   FHA when it imposes no fundamental alteration in the nature of the program or undue

10   financial or administrative burdens. *Id.*

11        66.    To make a *prima facie* showing in support of her failure to accommodate

12   claim, Plaintiff was required to give Defendants an opportunity to accommodate her.

13   *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012). The

14   defendants therefore must have had an idea of what accommodation Plaintiff sought prior

15   to their incurring liability for failing affirmatively to grant a reasonable accommodation.

16   *Id.* at 579.

17        67.    The denial can be either actual or constructive, "as an indeterminate delay

18   has the same effect as an outright denial." *Groome Res. Ltd. v. Parish of Jefferson*, 234

19   F.3d 192, 199 (5th Cir. 2000); *see also Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed.

20   App'x 617 622 (6th Cir. 2011). Moreover, the Joint Statement of two federal agencies[25]

21   counsels similarly: "An undue delay in responding to a reasonable accommodation

22

23

24   [25] Though the Joint Statement is a policy statement, rather than an authoritative interpretation of the FHA and therefore does "not warrant Chevron-style deference,"
25   *Christensen v. Harris Cnty.*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662-63, 146 L. Ed. 2d 621 (2000), it is nonetheless "'entitled to respect'" to the extent it has the "'power to
26   persuade.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164, 89 L. Ed. 124 (1944)).

1  request may" constitute a failure to accommodate. Department of Justice and HUD, Joint

2  Statement on Reasonable Accommodations at 11 (May 17, 2004).[26]

3  **Discrimination by retaliation violates the FHA.**

4  68.     It is unlawful under the FHA to retaliate against a person on the basis that

5  the person has engaged in a "protected activity." 42 U.S.C. § 3617. Pursuing one's rights

6  under the ADA constitutes a protected activity. *See, e.g., McAlindin v. County of San*

7  *Diego*, 192 F.3d 1226, 1238 (9th Cir. 1999) (stating that "vigorously asserting [one's]

8  rights" under the ADA and other state and federal discrimination laws constitutes

9  protected activity).

10  69.     To make out a *prima facie* FHA retaliation case, a plaintiff must establish:

11  (**1**) that she engaged in a protected activity; (**2**) an adverse housing consequence casually

12  linked to that activity; and (**3**) resulting damage. *Hall v. Meadowood*, 7 F. App'x 687, 688

13  (9th Cir. 2001).

14  70.     Once the plaintiff has established a *prima facie* case of retaliation, the

15  burden of production shifts to the defendant to articulate some legitimate,

16  nondiscriminatory reason for the adverse action. *Tarin v. County of Los Angeles*, 123

17  F.3d 1259, 1264 (9th Cir. 1997).

18  **Emotional and psychological harms are FHA-compensable injuries.**

19  71.     Injuries such as emotional distress, humiliation and mental disorders are

20  compensable under FHA. *Secretary on behalf of Bobbie Burris and Bobbie Burris v Jess*

21  *Aylett, et al.* (1/5/94) HUDALJ 08-90-0283-1; *United States v. Town of Colo. City*, 2015

22

23  [26] *See* https://www.hud.gov/sites/documents/huddojstatement.pdf; *see also* Fed. R.
24  Evid. 201(b); *Japanese Vill., Ltd. Liab. Co. v. Fed. Transit Admin.*, 843 F.3d 445, 454
(9th Cir. 2016) (noting that judicial notice might ordinarily be appropriate for the
25  documents "made publicly available by government entities … and neither party disputes
the authenticity of the web site[] or the accuracy of the information displayed therein.")
26  (citing *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010)).

U.S. Dist. LEXIS 78566, at *3 (D. Ariz. June 17, 2015) (citing *United States v. Balistrieri*, 981 F.2d 916, 927 (7th Cir. 1992)).

72.     Damages for emotional distress may be inferred from circumstances of discrimination, and may be established by testimony. *Secretary on behalf of Steve Ellis Times and Betty A. Brinson v Annette Banai, et al.* (2/3/95) HUDALJ 04-93-2060-8; *see also Secretary on behalf of Blanton B. Holley v Thomas C. Baumgardner* (11/15/90) HUDALJ 05-89-0306-1.

73.     Accordingly, the fact that a plaintiff may be unusually emotionally sensitive and incur great emotional harm from discriminatory conduct does not absolve defendant from responsibility for greater emotional harm. *Secretary on behalf of Durand Evan and Durand Evan v Nancy Dutra, et al.* (11/12/96) HUDALJ 09-93-1753-8.

74.     In fair housing cases, discriminators must take their victims as they find them; damages are measured on injuries actually suffered by victim and not on basis of injuries that would be suffered by reasonable or ordinary person. *Secretary on behalf of Agnes M. Guard and Agnes M. Guard v Ocean Sands, Inc.* (9/3/93) HUDALJ 04-90-0231-1. Accordingly, a plaintiff's preexisting vulnerable constitution must be taken into consideration. *Secretary on behalf of Aulani Thompson v Donald E. Schilling and Faye Humphreys* (7/15/93) HUDALJ 04-92-0440-1.

75.     To this end, the usual standard employed to assess amount of compensatory damages for intangible injuries is reaction by one considered reasonable plaintiff to defendant's discriminatory actions; that reaction will necessarily vary with degree of egregiousness of defendant's conduct. *Secretary on behalf of Delores Hughes, et al. v Wayne Colber* (2/9/95) HUDALJ 05-93-0510-1.

76.     Injunctive relief may be obtained upon proper showings in a § 3604 action. *Wharton v. Knefel*, 562 F.2d 550, 1977 U.S. App. LEXIS 11520 (8th Cir. 1977).

77.    Punitive damages are also recoverable under the FHA if the Court finds a discriminatory housing practice has occurred. 42 U.S.C. § 3613(c)(1).

**Standard for punitive damage awards under Arizona law.**

78.    For a fact finder to award punitive damages under Arizona law a plaintiff must prove "[s]omething more than the mere commission of a tort." *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986). The tortfeasor's mental state determines whether a jury can award punitive damages. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986) (tortfeasor's actions must surpass "gross negligence or mere reckless disregard of the circumstances."); *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 (plaintiff must prove that the tortfeasor's "evil hand was guided by an evil mind.").

79.    A tortfeasor manifests an "evil mind" if he either "intended to injure the plaintiff" or "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Gurule v. Ill. Mut. Life and Cas. Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987) (quoting *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578). His conduct need not be "outrageous" in order for the plaintiff to recover, but he must "continue[] his actions despite the inevitable or highly probable harm that would follow." *Id.* Further, the plaintiff must establish intent or conscious pursuit with "clear and convincing evidence" that the tortfeasor's conduct "was motivated by spite, actual malice, or intent to defraud" or by a "conscious and deliberate disregard of the interests *and rights* of others." *Id.* at 602-03 n.3, 734 P.2d at 87-88 n.3 (emphasis added).

**Employers are vicariously liable for their employees' FHA violation(s).**

80.    The FHA provides for vicarious liability. *Meyer v. Holley*, 537 U.S. 280, 282, 123 S. Ct. 824, 827, 154 L.Ed.2d 753, 759 (2003).

81.    In applying imputed or vicarious liability theories in housing discrimination cases under 42 U.S.C. § 3604, a finding that an agent or employee acted with corporate

defendant's approval or at his specific direction is not necessary to hold owner liable where owner has been found to have power to control acts of his agents or employees. *Secretary on behalf of Shayleen Turner and Tskeai Louise Dockery v David C. French, et al.* (9/12/95) HUDALJ 09-93-1710-8. (duty of property owners not to discriminate is nondelegable; consequently, property owners may be held liable for discriminatory actions of their employees or agents).

82.     The general rule therefore in FHA cases is that the principal is legally responsible for acts, conduct, and statements of its agents that are done within scope of agent's apparent authority. *Secretary on behalf of Jerome Bradford and Victoria Bradford v Pheasant Ridge Associates Limited, et al.* (10/25/96) HUDALJ 05-94-0845-8 and 05-95-0155-8.

83.     Punitive damages are allowed against an employer for acts of its employees "so long as committed in the furtherance of the employer's business and acting within the scope of employment." *Wiper v. Downtown Dev. Corp. of Tucson,* 152 Ariz. 309, 732 P.2d 200 (1987) (punitive damages) (quoting *Western Coach Co. v. Vaughn*, 9 Ariz. App. 336, 338-39, 452 P.2d 117, 119-20 (1969)).

**B.     THE REHABILITATION ACT**

84.     The Rehabilitation Act of 1973, (the "RA"), provides that no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

85.     The RA therefore applies broadly to all sorts of private organizations so long as they receive federal funding and are principally engaged in providing one of services enumerated in § 794, even private membership organizations who receive

federal funding. *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 91 Fed. R. Serv. 3d (Callaghan) 1465, 2015 U.S. App. LEXIS 7651 (7th Cir. 2015).

86.     The statute defines program or activity, in relevant part, as all of the operations of an entire corporation or other private organization: **(1)** if assistance is extended to such corporation or private organization as a whole; or **(2)** which is principally engaged in the business of providing health care, **housing**, or social services. 29 U.S.C. § 794(b)(3), *Sw. Fair Hous. Council v. WG Campana del Rio SH LLC*, No. CV-19-00179-TUC-RM, 2021 U.S. Dist. LEXIS 18357, at *1 (D. Ariz. Feb. 1, 2021).

87.     The RA also provides handicapped persons with affirmative rights, creates private right of action, and does not require exhaustion of administrative remedies. *Adashunas v. Negley*, 626 F.2d 600, 1980 U.S. App. LEXIS 15205 (7th Cir. 1980).

88.     Disability discrimination and retaliation in a housing context are therefore actionable under both the FHA and the RA. *Neudecker v. Boisclair Corp.*, 1 Accom. Disabilities Dec. (CCH) P 1-089, 11 Accom. Disabilities Dec. (CCH) ¶ 1-089, 351 F.3d 361, 1 Accom. Disabilities Dec. (CCH) ¶ 1-089, 11 Accom. Disabilities Dec. (CCH) P11-089, 14 Am. Disabilities Cas. (BNA) 1899, 2003 U.S. App. LEXIS 24611 (8th Cir. 2003).

89.     To prevail on a claim for damages under § 504 of the Rehabilitation Act, 29 U.S.C.S. § 794, plaintiff must prove a *mens rea* of intentional discrimination, and that standard may be met by showing deliberate indifference, not only by showing discriminatory animus. *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1199 (9th Cir. 2016).

90.     Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood. *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1129 (9th Cir. 2001)

**C.     THE ALC'S JURY TRIAL WAIVER IS UNENFORCEABLE**

91.     The Seventh Amendment right to a jury trial in federal court is governed by federal law. *Simler v. Conner*, 372 U.S. 221, 221-22, 83 S. Ct. 609, 9 L. Ed. 2d 691 (1963).

92.     There is a strong presumption under federal law against the waiver of this fundamental right. *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1378 (9th Cir.1997) (holding that courts "must indulge every reasonable presumption against the waiver of the jury trial").

93.     As set forth previously herein, the ALC contains a jury trial waiver provision. (Ex. 1 ¶ 38). However, a contractual waiver of the right to a jury trial is enforceable therefore only when it is made knowingly, voluntarily, and intelligently. *Breham v. Asset Acceptance, LLC*, No. CV-09-1474-PHX-GMS, 2010 U.S. Dist. LEXIS 50612, at *3 (D. Ariz. Apr. 27, 2010); *Phoenix Leasing. v. Sure Broad.*, 843 F. Supp.1379, 1384 (D. Nev. 1994) (citing *Standard Wire & Cable Co. v. AmeriTrust Corp.*, 697 F. Supp. 368, 375 (C.D. Cal.1988)); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007*); K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 756 (6th Cir. 1985).

94.     The factors consistently used by courts to determine whether a waiver was knowing, voluntary, and intelligent include: **(1)** whether there was a gross disparity in bargaining power between the parties; **(2)** the business or professional experience of the party opposing the waiver; **(3)** whether the opposing party had an opportunity to negotiate contract terms; and **(4)** whether the clause containing the waiver was inconspicuous. *See MZ Ventures LLC v. Mitsubishi Motor Sales of Am., Inc.,* 1999 U.S. Dist. LEXIS 14421, 1999 WL 33597219, at *16 (C.D. Cal. Aug. 31, 1999) (observing that defendant's failure to present evidence that plaintiff had equal bargaining power weighed in favor of denying the motion to strike jury demand); *see also Phoenix Leasing,*

843 F. Supp. at 1384 (quoting *Hydramar, Inc. v. Gen. Dynamics Corp.*, 1989 U.S. Dist. LEXIS 15784, 1989 WL 159267, at *3 (E.D. Pa. Dec. 29, 1989)).

95.     Accordingly, there is no evidence suggesting that the ALC jury trial waiver was negotiable. *See Ginsberg v. Silversea Cruises Ltd,* 2004 U.S. Dist. LEXIS 28272, 2004 WL 3656827, at *2 (S.D. Fla. Mar. 18, 2004) (holding that waiver was invalid where the form included standardized language, was drafted by the defendant, and was nonnegotiable); *Breham, v. Asset Acceptance, LLC*, No. CV-09-1474-PHX-GMS, 2010 U.S. Dist. LEXIS 50612, at *5-6 (D. Ariz. Apr. 27, 2010).

96.     Furthermore, when Plaintiff signed the ALC on September 29, 2021 she was in the intensive care unit at Flagstaff Medical Center after nearly bleeding to death from hemorrhagic peptic ulcers and where she had repeatedly lost consciousness. Due to her critical-illness, which included losing nearly half of her total blood volume causing her to experience a profoundly-altered mental state[27] Plaintiff lacked the requisite capacity, let alone an equal ability to bargain with Forest Ridge, before entering into the ALC.

## VI.   **DAMAGES**

97.     Plaintiff has been damaged by Defendants' unlawful discriminatory conduct.

98.     Defendants damaged Plaintiff when they discriminated against her by failing to respond to her March 25, 2022 written request for reasonable accommodations to have testing for pathogenic mold performed in her home prior to Defendants' cleaning of the ductwork. Defendant's failure to respond was a constructive denial of her request.

99.     Defendants damaged Plaintiff on March 28, 2022 when, knowing that she is a disabled person and on the basis of her having engaged in a protected activity,

---

[27] This fact is well-supported by Plaintiff's hospital records.

27

Defendants intentionally retaliated against Plaintiff for her March 25, 2022 request for reasonable accommodations by attempting to throw Plaintiff and her assistance animals out of her home and into the cold while Defendants' agents performed work in Plaintiff's home.

100.   On March 28, 2022 Defendants damaged Plaintiff when they discriminated against her by written communication to her implying that Plaintiff's pathogenic mold-related disability meant that she was no longer welcome as a tenant and should find somewhere else to live.

101.   On March 31, 2022 Defendants damaged Plaintiff when they discriminated against her by attempting to unlawfully evict Plaintiff in retaliation for her refusal to acquiesce to Defendants' March 28, 2022 "offer" for a mutual lease break after Plaintiff's disclosure to Defendants of her pathogenic mold-related disability.

102.   On March 31, 2022 Defendants damaged Plaintiff when they discriminated against her by attempting to unlawfully evict Plaintiff in retaliation for her March 25, 2022 request for reasonable accommodations, which was a protected activity.

103.   Defendants damaged Plaintiff when they discriminated against her by failing to respond to her April 16, 2022 written request for reasonable accommodations that Defendants provide her and her assistance animals with shelter during the April 21, 2022 remediation and where Defendants had instructed Plaintiff to remove herself and her assistance animals during the remediation. Defendant's failure to respond was a constructive denial of her request.

104.   Defendants damaged Plaintiff when they discriminated against her by failing to respond to her April 20, 2022 written request for reasonable accommodations that Defendants provide Plaintiff and her assistance animals with shelter during the time that remediation work in her home was to be performed, due to her past exposure to pathogenic mold and the serious and long-lasting health complications resulting

therefrom, and where this request was supported by a letter from Plaintiff's physician. Defendant's failure to respond was a constructive denial of her request.

105.    Defendants damaged Plaintiff when they discriminated against her by failing to respond to her May 10, 2022 written request for reasonable accommodations that Defendants comply with the ALC's pre-entry notice requirement. Defendant's failure to respond was a constructive denial of her request.

106.    On June 8, 2022 Defendants damaged Plaintiff when they refusing to renew her lease in retaliation for her repeated exercise of her right to request reasonable accommodations, which is protected under federal law.

107.    As a result of Defendants' unlawful and discriminatory practices, Plaintiff will be deprived of her home in that Defendants now seek to terminate her lease effective September 1, 2022.

108.    As a result of Defendants' extreme and outrageous conduct Plaintiff is now experiencing more frequent pain of a much greater severity, pain which is directly related to her physical disability, and where she is now prescribed additional medications for pain control by her treating physician.[28]

109.    As a result of Defendants' extreme and outrageous conduct, Plaintiff's peptic ulcers, which had been stable since her discharge from the ICU in 2021, have now worsened to the point where, in June of 2022, she required urgent medical treatment.

110.    As a result of Defendants' extreme and outrageous conduct Plaintiff's mental health disabilities, including her anxiety and major depressive disorders, have significantly worsened. She now suffers from panic attacks where, prior to the conduct by Defendants, her panic disorder condition was well-controlled by medication and counseling therapy.

---

[28] By choice, Plaintiff does not use any opioid medication(s) for pain relief.

111.   As a result of Defendants' extreme and outrageous conduct Plaintiff now lives in constant fear that Defendants will again try to evict her unlawfully, which could then permanently disqualify her from the Housing Choice Voucher Program. *See* 24 C.F.R. § 982.552 *et seq.*

112.   As a result of Defendants' unlawful and discriminatory practices, Plaintiff has now developed insomnia severe enough to require prescription sleep medication to treat.

113.   As a result of Defendants' discriminatory practices, Plaintiff is now forced to secure new housing which, owing to her present fragile physical, emotional, and psychological state, she has as yet been unable to do. This has caused her to suffer substantial emotional distress.

114.   As a result of Defendants' discriminatory practices, Plaintiff has also suffered substantial emotional distress including humiliation and embarrassment.

## VII.   CLAIMS FOR RELIEF

### Count I: Violation of the Fair Housing Act

### 42 U.S.C. §3604 – Discrimination in the rental of housing

115.   Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

116.   This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*

117.   The Fair Housing Act prohibits a landlord's refusal to make reasonable accommodations for a tenant when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(2), (f)(3)(B). The elements of a failure-to-accommodate claim under FHA do not specifically require an affirmative request for accommodation. *See Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003).

118.   Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

119.   To establish a failure-to-accommodate claim under 42 U.S.C. § 3604(f), the plaintiff must show demonstrate that: (**1**) she suffers from a handicap as defined by the FHAA; (**2**) defendants knew or reasonably should have known of the plaintiff's handicap; (**3**) accommodation of the handicap "may be necessary" to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (**4**) defendants refused to make such accommodation.

120.   On <u>March 25, 2022</u> Plaintiff made a written request to Defendants for reasonable accommodations: Before beginning HVAC duct cleaning in Plaintiff's home, Defendants have testing performed to determine if pathogenic mold species were present because she had previously been exposed to pathogenic mold species and is now "very reactive" thereto. <u>Plaintiff's written request to Defendants established: (**1**) the existence of a covered handicap; (**2**) the Defendants' knowledge or constructive knowledge of that handicap; (**3**) that an accommodation may be necessary; and (**4**) that the accommodation is reasonable</u>.

121.   This accommodation was reasonable on its face in that it imposed no fundamental alteration in the nature of the program or undue financial or administrative burdens. *Giebeler*, 343 F.3d at 1157. Even if this accommodation was not reasonable on its face, special circumstances warrant a finding that the requested accommodation is reasonable on the particular facts. *Id.*

122.   Defendants constructively denied Plaintiff's request for reasonable accommodation when they failed to in any manner respond to the request.

123.   Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by their failure to

31

accommodate Plaintiff or to even acknowledge Plaintiff's request for reasonable accommodations.

124.    Defendants' conduct was guided by an evil mind in that: **(1)** the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she disclosed to Defendants; **(2)** the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and **(3)** this conduct continued despite the inevitable or highly probable harm that would follow.

125.    Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

## Count II: Violation of the Fair Housing Act
### 42 U.S.C. § 3604(f)(2) – Intentional discrimination

126.    Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

127.    This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*

128.    Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

129.    On March 25, 2022 Defendants notified Plaintiff that Breathe Easy AZ was scheduled to perform remediation work in Plaintiff's home on March 29, 2022, requested that Plaintiff make arrangements to allow Defendants' agents access to her home, and that if Plaintiff had pets to either make arrangements to be home, or for the animals to be kenneled.

130.   On March 25, 2022 Plaintiff notified Defendants of her pathogenic mold-related disability.

131.   On March 28, 2022 Defendants communicated to Plaintiff in writing to request that she and her assistance animals vacate the residence during the maintenance scheduled to begin the next morning, on a day where the high temperature in Flagstaff only reached 41°F.

132.   Defendants' therefore intentionally discriminated against Plaintiff by disparate treatment on the basis of Plaintiff's pathogenic mold-related disability when, after learning of this disability, they instructed Plaintiff to remove herself and her assistance animals from her home without providing or even offering to her any alternative shelter, on a very cold day.

133.   Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by Defendants' subsequent instruction to Plaintiff after Plaintiff's disclosure to Defendants of her pathogenic mold-related disability  that she leave her home with her assistance animals on a very cold day and where Defendants failed to provide Plaintiff with any alternative shelter during the time she was to be away from her home

134.   Defendants' conduct was guided by an evil mind in that: (**1**) the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she previously disclosed to Defendants; (**2**) the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and (**3**) this conduct continued despite the inevitable or highly probable harm that would follow.

135.   Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

### Count III: Violation of the Fair Housing Act

### 42 U.S.C. §3604 – Discrimination in the rental of housing

136.   Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

137.   This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*

138.   Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

139.   On March 28, 2022 Defendants damaged Plaintiff when they discriminated against her by written communication to her implying that Plaintiff's pathogenic mold-related disability meant that she was no longer welcome as a tenant and should find somewhere else to live.

140.   Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by their failure to accommodate, or even acknowledge Plaintiff's request.

141.   Defendants' conduct was guided by an evil mind in that: **(1)** the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she previously disclosed to Defendants; **(2)** the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and **(3)** this conduct continued despite the inevitable or highly probable harm that would follow.

142.   Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

## Count IV: Violation of the Fair Housing Act
### 42 U.S.C. § 3617 – Interference, coercion, or intimidation

143.   Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

144.   This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*

145.   Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

146.   To make out a *prima facie* FHA retaliation case, a plaintiff must establish: (**1**) that she engaged in a protected activity; (**2**) an adverse housing consequence casually linked to that activity; and (**3**) resulting damage.

147.   On March 25, 2022 Plaintiff engaged in a protected activity when she made a request for reasonable accommodations.

148.   On March 28, 2022 Defendants retaliated against Plaintiff for March 25, 2022 requests for reasonable accommodations by attempting to throw Plaintiff and her assistance animals out of their home and into the cold while work was performed in Plaintiff's home.

149.   Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by their instruction to Plaintiff that she remove herself and her assistance animals from her home after she made a request for reasonable accommodations.

150.    Defendants' conduct was guided by an evil mind in that: **(1)** the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she previously disclosed to Defendants; **(2)** the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and **(3)** this conduct continued despite the inevitable or highly probable harm that would follow.

151.    Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

### Count V: Violation of the Fair Housing Act

### 42 U.S.C. § 3617 – Interference, coercion, or intimidation

152.    Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

153.    This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*

154.    Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

155.    To make out a *prima facie* FHA retaliation case, a plaintiff must establish: **(1)** that she engaged in a protected activity; **(2)** an adverse housing consequence casually linked to that activity; and **(3)** resulting damage.

156.    On March 25, 2022 Plaintiff engaged in a protected activity when she made a request for reasonable accommodations.

36

157.   On March 31, 2022 Defendants discriminated against Plaintiff when they attempted to unlawfully evict her in retaliation for Plaintiff's March 25, 2022 request for reasonable accommodations.

158.   Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by their immediate retaliation against Plaintiff for her request for reasonable accommodations.

159.   Defendants conduct was guided by an evil mind in that: **(1)** the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she previously disclosed to Defendants; **(2)** the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and **(3)** this conduct continued despite the inevitable or highly probable harm that would follow.

160.   Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

**Count VI: Violation of the Fair Housing Act**

**42 U.S.C. §3604 – Discrimination in the rental of housing**

161.   Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

162.   This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq*.

163.   The Fair Housing Act prohibits a landlord's refusal to make reasonable accommodations for a tenant when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(2), (f)(3)(B). The elements of a failure-to-accommodate claim under FHA do not specifically

1  require an affirmative request for accommodation. *See Giebeler v. M & B Assocs.*, 343

2  F.3d 1143, 1147 (9th Cir. 2003).

3      164.   Defendants own and/or lease dwellings within the meaning of 42 U.S.C. §

4  3602(b), which includes "any building, structure, or portion thereof which is occupied as,

5  or designed or intended for occupancy as, a residence by one or more families."

6      165.   To establish a failure-to-accommodate claim under 42 U.S.C. § 3604(f), the

7  plaintiff must show demonstrate that: **(1)** she suffers from a handicap as defined by the

8  FHAA; **(2)** defendants knew or reasonably should have known of the plaintiff's handicap;

9  **(3)** accommodation of the handicap "may be necessary" to afford plaintiff an equal

10  opportunity to use and enjoy the dwelling; and **(4)** defendants refused to make such

11  accommodation.

12      166.   On April 20, 2022 Plaintiff made a written request to Defendants for

13  reasonable accommodations: Defendants provide her and her assistance animals with

14  shelter during the upcoming April 21, 2022 remediation and where Defendants had

15  instructed Plaintiff to remove herself and her assistance animals during the remediation.

16  This request included an attached letter from Plaintiff's physician supporting her request.

17      167.   Plaintiff's written request to Defendants established: **(1)** the existence of a

18  covered handicap; **(2)** the Defendants' knowledge or constructive knowledge of that

19  handicap; **(3)** that an accommodation may be necessary; and **(4)** that the accommodation

20  is reasonable.

21      168.   This accommodation was reasonable on its face in that it imposed no

22  fundamental alteration in the nature of the program or undue financial or administrative

23  burdens. *Giebeler*, 343 F.3d at 1157. Even if this accommodation was not reasonable on

24  its face, special circumstances warrant a finding that the requested accommodation is

25  reasonable on the particular facts. *Id.*

26

169. Defendants constructively denied Plaintiff's request for reasonable accommodation when they failed to in any manner respond to the request.

170. Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by their failure to accommodate Plaintiff or to even acknowledge Plaintiff's request for reasonable accommodations.

171. Defendants' conduct was guided by an evil mind in that: **(1)** the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she disclosed to Defendants; **(2)** the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and **(3)** this conduct continued despite the inevitable or highly probable harm that would follow.

172. Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

### Count VII: Violation of the Fair Housing Act
### 42 U.S.C. §3604 – Discrimination in the rental of housing

173. Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

174. This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq.*

175. Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

176.   The Fair Housing Act prohibits a landlord's refusal to make reasonable accommodations for a tenant when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(2), (f)(3)(B). The elements of a failure-to-accommodate claim under FHA do not specifically require an affirmative request for accommodation. *See Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003).

177.   To establish a failure-to-accommodate claim under 42 U.S.C. § 3604(f), the plaintiff must show: **(1)** the existence of a covered handicap; **(2)** the defendant's knowledge or constructive knowledge of that handicap; **(3)** that an accommodation may be necessary; **(4)** that the accommodation is reasonable; and **(5)** that the defendant refused to make the necessary and reasonable accommodation upon request.

178.   On April 21, 2022 Plaintiff made a written request to Defendants for reasonable accommodations: For Defendants to comply with the pre-entry notice requirement set forth under the ALC.

179.   At no time thereafter did Defendants respond to this request for reasonable accommodations.

180.   Plaintiff's written request to Defendants established: **(1)** the existence of a covered handicap; **(2)** the Defendants' knowledge or constructive knowledge of that handicap; **(3)** that an accommodation may be necessary; and **(4)** that the accommodation is reasonable.

181.   Defendants' constructively denied Plaintiff's written request for this reasonable accommodation when they failed to respond to her request.

182.   Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by their failure to accommodate, or even acknowledge Plaintiff's request.

183. Defendants' conduct was guided by an evil mind in that: **(1)** the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she previously disclosed to Defendants; **(2)** the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and **(3)** this conduct continued despite the inevitable or highly probable harm that would follow.

184. Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

### Count VIII: Violation of the Fair Housing Act

### 42 U.S.C. § 3617 – Interference, coercion, or intimidation

185. Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

186. This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et seq*.

187. Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

188. The Fair Housing Act prohibits discriminatory conduct designed to drive a disabled individual out of his or her home. 42 U.S.C. § 3617.

189. Defendants damaged Plaintiff when, knowing that Plaintiff is a disabled person and in retaliation for her exercise of rights protected under federal law, Defendants engaged in discriminatory conduct intended to drive Plaintiff out of her home.

190.   On June 8, 2022 discriminated against Plaintiff by refusing to renew her lease in retaliation for Plaintiff's repeated requests for reasonable accommodations.

191.   Defendants' deliberate indifference to Plaintiff's rights as a disabled individual to be free from housing discrimination is established by their refusal to renew Plaintiff's lease after her repeated requests for reasonable accommodations, requests that each time went unanswered by Defendants.

192.   Defendants' conduct was guided by an evil mind in that: **(1)** the conduct was directly based on the knowledge of Plaintiff's pathogenic mold-related disability which she previously disclosed to Defendants; **(2)** the actions of the Defendants surpassed gross negligence or mere reckless disregard of the circumstances because Defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff; and **(3)** this conduct continued despite the inevitable or highly probable harm that would follow.

193.   Plaintiff has been damaged by Defendants' discriminatory conduct. Accordingly, she is entitled to an award of compensatory and punitive damages against Defendants.

**Count IX: Violation of the Rehabilitation Act**

**29 U.S.C. § 794 – Discrimination under program receiving federal assistance**

194.   Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

195.   This action is brought to enforce the Rehabilitation Act, 29 U.S.C. § 794.

196.   The Rehabilitation Act provides that no otherwise qualified individual with a disability shall be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

197.   Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

198.   Defendants are therefore principally engaged in providing a service enumerated under § 794(b)(3).

199.   On March 31, 2022 Defendants discriminated against Plaintiff under a program or activity receiving federal financial assistance when, on the basis of Plaintiff's status as a disabled person and her March 25, 2022 request for reasonable accommodations, Defendants attempted to unlawfully evict Plaintiff for her non-existent violation of the ALC.

200.   Plaintiff has been damaged as a result of Defendants' discriminatory conduct in an amount to be determined at trial.

### Count X: Violation of the Rehabilitation Act

**29 U.S.C. § 794 – Discrimination under program receiving federal assistance**

201.   Plaintiff repeats and incorporates by reference all preceding paragraphs in support of this claim.

202.   This action is brought to enforce the Rehabilitation Act, 29 U.S.C. § 794.

203.   The Rehabilitation Act provides that no otherwise qualified individual with a disability shall be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

204.   Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

205.   Defendants are therefore principally engaged in providing a service enumerated under § 794(b)(3).

206. On June 8, 2022 Defendants discriminated against Plaintiff under a program or activity receiving federal financial assistance when, on the basis of Plaintiff's status as a disabled person and her repeated prior requests for reasonable accommodations, Defendants refused to renew Plaintiff's residential lease.

207. Plaintiff has been damaged as a result of Defendants' discriminatory conduct in an amount to be determined at trial.

## VIII.  INJUNCTION ALLEGATIONS

208. Defendants' unlawful policy, practices, and customs are ongoing and continue to violate Plaintiff's rights and likely the rights of other tenants and/or applicants, and as such there is no adequate remedy at law. Plaintiff is entitled to injunctive relief prohibiting Defendants from discriminating against disabled tenants.

## IX.    PRAYER FOR RELIEF

209. WHEREFORE, Plaintiff prays for relief as follows:

a. For trial by jury on all claims;

b. For a declaration that Defendants' conduct violated federal fair housing laws;

c. For a permanent injunction to stop Defendants' illegal conduct and prevent it from occurring again in the future, including requirements of adopting a new non-discriminatory policy, training, monitoring, testing, reporting, and auditing;

d. For general compensatory damages on all claims in an amount to be proven at the time of trial;

e. For punitive damages under 42 U.S.C. § 3613(c)(1), and as otherwise allowed by law;

f. For relocation expenses in the amount of $5000;

44

g.  For Plaintiff's costs of suit, disbursements, and attorney's fees pursuant to 42 U.S.C. § 3613(c)(2), 29 U.S.C. § 794, and as otherwise allowed by law;

h.  For leave to conform the pleadings to the proof at trial; and

i.  For such other and further relief as the Court deems just and proper.

## **VERIFICATION**

I, Karen McGhee, verify under penalty of perjury under the laws of the United States of America that the factual statements in this pleading are true and correct to the best of my knowledge.

This verification executed September 1, 2022, by:

/s/ Karen McGhee
*Plaintiff, pro se*